**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Stefan Bogdanovich (State Bar No. 324525)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com
        sbogdanovich@bursor.com

**BURSOR & FISHER, P.A.**
Christopher R. Reilly (*pro hac vice application forthcoming*)
701 Brickell Avenue, Suite 1420
Miami, FL 33131
Telephone: (305) 330-5512
Facsimile:  (305) 676-9006
Email: creilly@bursor.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| THOMAS FAN, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| | **JURY TRIAL DEMANDED** |
| NBA PROPERTIES, INC.; NATIONAL BASKETBALL PLAYERS ASSOCIATION; and DAPPER LABS, INC., | |
| Defendants. | |

Plaintiff Thomas Fan ("Plaintiff"), individually and on behalf of all other persons similarly situated, by and through his attorneys, makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself and his counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      This is a class action suit brought against Defendants NBA Properties, Inc. ("NBA"), the National Basketball Players Association ("Players") Dapper Labs, Inc. ("Dapper Labs") for violating the Video Privacy Protect Act ("VPPA") by collecting and sharing highly sensitive and specific information about basketball fans' video consumption habits without their informed written consent.

2.      NBA Top Shot is an unincorporated joint venture created by the Defendants to sell blockchain "moments" to basketball fans around the world.[1]  These moments can probably best be described as 21st Century trading cards, which allow fans to own specific pre-recorded video clips of their favorite NBA players performing highlight-worthy plays.[2]  And just like many trading cards, these NBA Top Shot pre-recorded video clips are minted, numbered, and released in limited quantities to make them collectible.[3]  However, unlike physical, tangible, trading cards, these NBA Top Shot video clips are owned through digital non-fungible tokens ("NFTs"), and data about the ownership of each pre-recorded video clip is stored on a ***private*** blockchain.[4]

---

[1] NBA COMMUNICATIONS, *NBA, NBPA and Dapper Labs bring first-of-its-kind blockchain game to basketball fans around the globe*, (July 31, 2019), https://pr.nba.com/nba-nbpa-dapper-labs-blockchain-game/.

[2] *Id.*

[3] For example, NBA Top Shot minted 32 video clips of Magic Johnson's legendary baby sky hook to win Game 4 of the 1987 Finals against the Boston Celtics, and each of these clips have sold for several thousands of dollars. *See* https://nbatopshot.com/listings/p2p/6d9f3306-7ced-41d7-bb87-3d2a12a0e97a+14b537fd-991f-4444-b878-5dd224999b85?utm_source=setpage&utm_medium=moment&utm_campaign=setpage.

[4] "In simplest terms, a 'blockchain' is a decentralized digital ledger used to record and validate transactions… Blockchains may be either public, like that underlying perhaps its most famous use-case, Bitcoin, or private, like Dapper Labs's Flow Blockchain.  While generally associated with the transfer of digital currencies (often called cryptocurrencies, or crypto for short), blockchains can be used not only to store information about the transfer of the currency but can also be applied to record ownership of a wide variety of more traditional assets, like stocks and bonds." *Friel v. Dapper Labs, Inc*., No. 21 CIV. 5837 (VM), 2023 WL 2162747, at *2 (S.D.N.Y. Feb. 22, 2023).

---

3.      NBA Top Shot generates random and ***anonymous*** usernames for basketball fans to buy and sell these video clips.  When a fan purchases a video clip, they receive a virtual non-fungible token ("NFT"), and NBA Top Shot records the transaction by adding their anonymous username to the public, online ledger.  This allows anyone with access to the internet to verify which username owns which video clip.  One of the main appeals of blockchain technology like this is that it allows anyone to verify the ownership of an asset while simultaneously keeping the owner's identity anonymous.[5]

4.      Except, in the case of NBA Top Shot moments, the owners' identities are neither kept anonymous nor private.  NBA Top Shot discloses personally identifiable information ("PII")—including a record of every documentary video consumed by Plaintiff and class members—to unrelated third parties without their informed written consent.  NBA Top Shot installed computer code on its website, called the "Meta Tracking Pixel," which tracks and records Plaintiff and Class members' private video consumption.  Behind the scenes of the webpages where Plaintiff and class members can purchase video clips—and unbeknownst to video viewers—this code collects Plaintiff and class members' transaction history and discloses it to Meta Platforms, Inc.  ("Meta" or "Facebook")—***completely separately from the blockchain***.  Meta, in turn, uses Plaintiff and class members' video consumption habits to deliver targeted advertisements to them.

5.      Defendants' disclosures violated the VPPA.  The VPPA was meant to give consumers the power to "maintain control over personal information divulged and generated in exchange for receiving services from video tape service providers."  S. Rep. No. 100-599, at 8.  "The Act reflects the central principle of the Privacy Act of 1974: that information collected for one purpose may not be used for a different purpose without the individual's consent."  *Id.*

---

[5] MEDIUM, *The Basics of Blockchain Privacy: How to Remain Anonymous on the Blockchain* (Aug. 3, 2022), https://medium.com/coinmonks/the-basics-of-blockchain-privacy-how-to-remain-anonymous-on-the-blockchain-3f1cef44ad63.

1

## PARTIES

2        6.      Plaintiff Thomas Fan is, and has been at all relevant times, a citizen of California

3    who resides in Contra Costa County, California.

4        7.      Defendant NBA Properties Inc. is a New York Corporation with its principal place

5    of business at 645 Fifth Ave., New York City, New York, United States.  Defendant NBA

6    Properties Inc. is a partner in the NBA Top Shot joint venture, which sells its blockchain video

7    clips throughout California and the United States.

8        8.      Defendant National Basketball Players Association is Delaware non-profit

9    corporation with its principal place of business at 1133 Avenue of the Americas, New York City,

10   New York, 10036.  Defendant National Basketball Players Association is a partner in the NBA Top

11   Shot joint venture, which sells its blockchain video clips throughout California and the United

12   States.

13       9.      Defendant Dapper Labs, Inc. is a Canadian corporation with its principal place of

14   business at 565 Great Northern Way #600, Vancouver, British Columbia, Canada, V5T0H8.

15   Defendant Dapper Labs, Inc. is a partner in the NBA Top Shot joint venture, which sells its

16   blockchain video clips throughout California and the United States.

17                            ## JURISDICTION AND VENUE

18       10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

19   1331 because it arises under a law of the United States (*i.e.*, the VPPA).  This Court also has

20   supplemental jurisdiction over the California state claim because it arises from the same

21   transactions and occurrences.  This Court also has jurisdiction under the Class Action Fairness Act

22   ("CAFA"), 28 U.S.C. §§ 1332(a), 1332(d)(2).  The amount in controversy exceeds $5,000,000,

23   exclusive of interest and costs, and there are more than 100 members of the Class and the

24   California Subclass, and there is minimal diversity.

25       11.     This Court has personal jurisdiction over Defendants because they conduct

26   substantial business within California, including (1) the sale, marketing, and advertising of NBA

27   TopShot NFTs to California consumers, (2) the collection of private information from Californian

28   basketball fans, and (3) the disclosure of every NBA TopShot NFT owner's private information to

a California corporation, Meta Platforms, Inc.  Furthermore, a substantial portion of the events giving rise to Plaintiff's claims occurred in this state.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## FACTUAL BACKGROUND

**A.     The VPPA**

13.     The origins of the VPPA begin with President Ronald Reagan's nomination of Judge Robert Bork to the United States Supreme Court.  During the confirmation process, a movie rental store disclosed the nominee's rental history to the Washington City Paper, which was then published.  With an eye toward the digital future, Congress responded by passing the VPPA.  As Senator Patrick Leahy, who introduced the Act, explained:

> It is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home.  In an area of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the people they telephone.  I think that is wrong.

S. Rep. 100-599, at 5-6 (internal ellipses and brackets omitted).

14.     The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider."  18 U.S.C. § 2710(b)(1).  The VPPA defines personally identifiable information as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider."  18 U.S.C. § 2710(a)(3).  A video tape service provider is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials."  18 U.S.C. § 2710(a)(4).

1

**B.      The Meta Tracking Pixel**

2          15.      Facebook is the largest social networking site on the planet, touting 2.9 billion

3   monthly active users.[6]  Facebook describes itself as a "real identity platform,"[7] meaning users are

4   allowed only one account and must share "the name they go by in everyday life."[8]  To that end,

5   when creating an account, users must provide their first and last name, along with their birthday

6   and gender.[9]

7          16.      Meta owns facebook.com and generates revenue by selling advertising space on

8   Facebook, and other applications it owns, like Instagram.[10]

9          17.      Meta sells advertising space by highlighting its ability to target users.[11]  Meta can

10  target users so effectively because it surveils user activity both on and ***off its site***.[12]  This allows

11  Meta to make inferences about users beyond what they explicitly disclose, like their "interests,"

12  "behavior," and "connections."[13]  Meta compiles this information into a generalized dataset called

13  "Core Audiences," which advertisers use to apply highly specific filters and parameters for their

14  targeted advertisements.[14]

15

16

17

18  [6] Sean Burch, *Facebook Climbs to 2.9 Billion Users, Report 29.1 Billion in Q2 Sales*, YAHOO (July 28, 2021), https://www.yahoo.com/now/facebook-climbs-2-9-billion-202044267.html

19  [7] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).

20  [8] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY,
21  https://www.facebook.com/communitystandards/integrity_authenticity.

    [9] FACEBOOK, SIGN UP, https://www.facebook.com/
22
    [10] Mike Isaac, *Facebook's profit surges 101 percent on strong ad sales.*, N.Y. TIMES (July 28,
23  2021), https://www.nytimes.com/2021/07/28/business/facebook-q2-earnings.html.

24  [11] FACEBOOK, WHY ADVERTISE ON FACEBOOK,
    https://www.facebook.com/business/help/205029060038706.
25
    [12] FACEBOOK, ABOUT FACEBOOK PIXEL,
26  https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

    [13] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS,
27  https://www.facebook.com/business/ads/ad-targeting.

28  [14] FACEBOOK, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK,
    https://www.facebook.com/business/news/Core-Audiences.

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                                    5

18.     Advertisers can also build "Custom Audiences."[15]  Custom Audiences enable advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[16]  Advertisers can use a Custom Audience to target existing customers directly, or they can use it to build "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[17]  Unlike Core Audiences, Custom Audiences require an advertiser to supply the underlying data to Meta.  They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Facebook's "Business Tools," which collect and transmit the data automatically.[18]  One such Business Tool is the Meta Tracking Pixel.

19.     The Meta Tracking Pixel is a piece of code that advertisers, like Defendants, can integrate into their websites.  Once activated, the Meta Tracking Pixel "tracks the people and type of actions they take."[19]  When the Meta Tracking Pixel captures an action, it sends a record to Facebook.  Once this record is received, Meta processes it, analyzes it, and assimilates it into datasets like the Core Audiences and Custom Audiences.

20.     Advertisers control what actions—or, as Meta calls it, "events"—the Meta Tracking Pixel will collect, including the website's metadata, along with what pages a visitor views.[20]  Advertisers can also configure the Meta Tracking Pixel to track other events.  Meta offers a menu

---

[15] FACEBOOK, ABOUT CUSTOM AUDIENCES,
https://www.facebook.com/business/help/744354708981227?id=2469097953376494.

[16] FACEBOOK, ABOUT EVENTS CUSTOM AUDIENCE,
https://www.facebook.com/business/help/366151833804507?id=300360584271273.

[17] FACEBOOK, ABOUT LOOKALIKE AUDIENCES,
https://www.facebook.com/business/help/164749007013531?id=401668390442328.

[18] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE,
https://www.facebook.com/business/help/170456843145568?id=2469097953376494; FACEBOOK,
CREATE A WEBSITE CUSTOM AUDIENCE,
https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.

[19] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.

[20] See FACEBOOK, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED,
https://developers.facebook.com/docs/facebook-pixel/advanced/; see also FACEBOOK, BEST
PRACTICES FOR FACEBOOK PIXEL SETUP,
https://www.facebook.com/business/help/218844828315224?id=1205376682832142.

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                        6

of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[21]  An advertiser can also create their own tracking parameters by building a "custom event."[22]

21.     Advertisers control how the Meta Tracking Pixel identifies visitors.  The Meta Tracking Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific Data."[23]  HTTP Headers collect "IP addresses, information about the web browser, page location, document, referrer and persons using the website."[24]  Pixel-specific Data includes "the Pixel ID and cookie."[25]

**C.     NBA Top Shot and the Meta Pixel**

22.     NBA Top Shot operates the nbatopshot.com website. The website contains the full universe of NBA Top Shot "moments" that users can buy, sell, and trade on the website.

23.     NBA Top Shot "moments" are pre-recorded video clips of various past and present NBA players performing highlight-worthy plays—like dunks, blocks, assists, or game-winning jump shots.[26]  These video clips contain sound and can play on continuous repeat.[27]  Anyone can publicly view a video clip on the NBA Top Shot website, but only certain individuals can own a particular video clip.  Just like many physical sports trading cards, these video clips are minted, numbered, and released in limited quantities to make them collectible.

24.     Ownership of these NBA Top Shot video clips can be transferred through digital non-fungible tokens ("NFTs").  NFTs are digital assets whose authenticity and ownership can be recorded on a private blockchain.  Blockchains are digital ledgers used to record transactions. One of the main appeals of blockchain technology is that, through the use of a private blockchain, it

---

[21] FACEBOOK, SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142.

[22] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142.

[23] FACEBOOK, FACEBOOK PIXEL, https://developers.facebook.com/docs/facebook-pixel/.

[24] *Id.*

[25] *Id.*

[26] *Id*.

[27] *See, e.g.*, https://nbatopshot.com/listings/p2p/733bdf78-8ce0-4992-aa78-bd08c2746907+69ad0965-e3fd-43ad-800e-bc2830858030?utm_source=playerpage&utm_medium=moment&utm_campaign=playerpage.

allows anyone to verify the ownership of an asset while simultaneously keeping the owner's identity anonymous.[28]

25.     The ownership of a particular NBA Top Shot video clip is linked to a particular NFT.  So, for example, Defendants have minted 75 video clips of the basketball player Giannis Antetokoumpo performing highlights during a February 6, 2018 game against the New York Knicks.[29]  For these particular video clips, Defendants have created 75 unique NFTs bearing 75 unique serial numbers.  Only one NFT exists with a particular serial number, and only one NFT is linked to one video clip.  This makes each individual NBA Top Shot video clip unique.

26.     For the Giannis Antetokoumpo video clips mentioned above, the NBA Top Shot website provides, as of 6:01 p.m. PST September 28, 2023, that of these 75 NFTs, 10 were for listed for sale, 53 were owned but not for sale, and 12 were "hidden in packs."  *See* Figure 1, below.  Packs of video clips can be purchased from Defendants' website and will include a random assortment of video clips.  This is akin to packs for sports trading cards, which can also include a random assortment of cards.  The NBA Top Shot video clips, once owned, can also be burned, so that they can never be in circulation again.  This is akin to physically destroying a trading card.



**Figure 1**

[28] MEDIUM, *The Basics of Blockchain Privacy: How to Remain Anonymous on the Blockchain* (Aug. 3, 2022), https://medium.com/coinmonks/the-basics-of-blockchain-privacy-how-to-remain-anonymous-on-the-blockchain-3f1cef44ad63.

[29] https://nbatopshot.com/listings/p2p/733bdf78-8ce0-4992-aa78-bd08c2746907+9668dd1e-619f-4936-8f3b-33e67bbf4108?utm_source=setpage&utm_medium=moment&utm_campaign=setpage.

27.     The ownership of each unique NBA Top Shot NFT is recorded in a private blockchain—the "Flow Blockchain," which only Defendant Dapper Labs, Inc. has full access to.

28.     To purchase a particular video clip, Defendants require basketball fans and collectors to create an account with Defendant Dapper Labs, Inc. and to create a secret password to access this account.  Often times, fans and collectors are induced to sign up by the promise of a "free" pack of video clip(s).  *See* Figure 2.



**Figure 2**

29.     Once a basketball fan or collector signs up for an account, the NBA Top Shot website generates a random and ***anonymous*** username for that individual and thereby becomes a "user."  For example, when the undersigned created an account for purposes of drafting this complaint, the NBA Top Shot website assigned him with the username "biodegradable_fur_seal9104."  If that user then purchases a video clip, his or her random and anonymous username is recorded on the Flow Blockchain, along with the NFT that was purchased.

30.     Defendants publicly post on the NBA Top Shot website the usernames of the owners of particular video clips that are listed for sale.



**Figure 3**

31.     However, Defendants do not publicly disclose the real-life identities of these users. Users are able to keep their real-world identities hidden and anonymous with the randomly generated usernames generated by Defendants on the NBA Top Shot website.

32.     Unknown to NBA Top Shot users, however, NBA Top Shot also passes users' video consumption histories **and** their real-world to Meta.

33.     The nbatopshot.com website hosts the Meta Tracking Pixel.  On webpages containing the video clips, nbatopshot.com transmits four distinct events to Meta via the Meta Tracking Pixel: "Microdata," "ViewContent," "PageView," and "Button Click."  Figure 4, next page.  Microdata tells Meta the "title" of the specific video clip the NBA Top Shot user has requested or obtained, along with a description of the video.  Figure 5, next page.  ViewContent and PageView, on the other hand, tell Meta the URL of the webpage.  Figure 6, next page. The Fourth "Button Click" event tells Meta if and exactly when a user clicks on a clickable element on the webpage.



**Figure 4**

**Figure 5**

**Figure 6**

1

2

34.      The first three events, "ViewContent," "PageView,"and "Microdata,"

independently, permit an ordinary person to identify a video's content and title.

35.      If a particular user clicks the "SELECT AND BUY" button in Figure 4, the

"ButtonClick" event discloses to Meta the text of that button.  After a user clicks select and buy,

they are presented with a number of NFTs they can choose from, along with their prices and

owners, and their serial numbers.



**Figure 7**

36.      If user clicks on a particular moment, and clicks the "BUY FOR $[cost of NFT]"

button, they are taken to a payment page and three new events are sent to Meta, "ButtonClick,"

"P2PMomentPurchase," and "Purchase."  Figure 8, next page.



**Figure 8**

37.     The ButtonClick event includes the a "buttonText" custom parameter that discloses to Meta the "BUY FOR $0"[30] on the button from the previous page.  The ButtonClick event also includes the title of NFT in the "pageFeatures" custom parameter.  Additionally, all three of the events in Figure 8, "P2PMomentsPurchase," "Purchase" and "ButtonClick" include the URL of the previous page.  Figure 9.



**Figure 9**

---

[30] Regardless of the price of the particular video clip NFT in Figure 7, the buttonText transmitted to Meta says "$0."  For example, in Figure 7, the price of the NFT is $10, but it still states $0 in the buttonText.

38.     If a user thereafter inputs their payment information, and clicks "Pay with credit card," they are redirected to a receipt page.  Figure 10.  The Microdata event on that page discloses to Meta that a user has a receipt for this purchase.  Figure 11.



**Figure 10**



**Figure 11**

39.     When a visitor purchases a video clip NFT while logged into Facebook, the NBA Top Shot website compels a visitor's browser to transmit an identifying "computer cookie" to Meta called "c_user," for every single event sent through the Meta Tracking Pixel.  The c_user cookie contains that visitor's unencrypted Facebook ID.  When a user purchased the above video clip, for

example, the NBA Top Shot website compelled the browser to send cookies to Meta, as shown through a browser's developer tools. *See, e.g.*,  Figures 12-14, below.



**Figure 12**

▼ Request Headers

| | |
|---|---|
| :authority: | www.facebook.com |
| :method: | GET |
| :path: | /tr/? |
| | id=734566633667278&ev=PageView&dl=https%3A%2F%2Fnbatopshot.com%2Forder%2Fmo |
| | ment-purchase%2Ff9947dec-e2b1-49ad-97e2- |
| | 7fb8f4bdec00%3FisFromPurchase%3Dtrue%26isFromOnboarding%3Dfalse%26requestID%3D |
| | p2p%253A88ef52f7-74ff-4ba5-b4df- |
| | 9ebdf544a2c4%26status%3Dtx_submitted&rl=https%3A%2F%2Faccounts.meetdapper.com%2 |
| | F&if=false&ts=1696262029537&sw=1920&sh=1080&v=2.9.131&r=stable&ec=0&o=30&fbp |
| | =fb.1.1695944453731.2803166&cs_est=true&ler=other&it=1696262029207&coo=false&exp |
| | =a0&rqm=GET |
| :scheme: | https |
| Accept: | image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8 |
| Accept-Encoding: | gzip, deflate, br |
| Accept-Language: | en-US,en;q=0.9 |
| Cookie: | datr=IKMTZDnp92T5Bkqwh2LEBedt; sb=FXEXZF66qmf7QYrBRI0wetsn; c_user=1528550551; |
| | m_ls=%7B%22c%22%3A%7B%221%22%3A%22HCwAABbUsgsWvvuNyAITBBau0t6xCwA%22% |
| | 2C%222%22%3A%22GSwVQ8xMAAAWAhbY-aPEDBYAABV- |
| | HEwAABYAFtz5o8QMFgAAFigA%22%7D%2C%22d%22%3A%22822a51d5-e4f0-4dd6-a85d- |
| | c9f57f0367b8%22%2C%22s%22%3A%220%22%2C%22u%22%3A%226riktz%22%7D; |
| | xs=24%3ATWFeKjQ4G0FB5A%3A2%3A1679257972%3A- |
| | 1%3A2280%3A%3AAcUZEiQ7N8_vT7QJjPuRdjc3cseRFnF-nFDYMeOdagl; |
| | fr=0V08k3uWHNa4OFcGj.AWUQC5ePOwhboLfW0YKneJrp6zQ.BIFgye.WQ.AAA.0.0.BIFgye.AWV |
| | fMjBAQXM |
| Referer: | https://nbatopshot.com/ |

**Figure 13**

| Request Cookies | ☐ show filtered out request cookies | |
| Name | Value | Domain |
| --- | --- | --- |
| datr | IKMTZDnp92T5Bkqwh2LEBedt | .facebook.com |
| sb | FXEXZF66qmf7QYrBRI0wetan | .facebook.com |
| c_user | 1528550551 | .facebook.com |
| m_ls | %7B%22c%22%3A%7B%221%22%3A%22HCwAABbUsgsWvvuNyAITBBau0t6xC... | .www.facebook.com |
| xs | 24%3ATWFeKjQ4G0FB5A%3A2%3A1679257972%3A-1%3A2280%3A%3AAcUZEi... | .facebook.com |
| fr | 0V08k3uWHNa4OFcGj.AWUQC5ePOwhboLfW0YKneJrp6zQ.BlFgye.WQ.AAA.0.0.... | .facebook.com |

**Figure 14**

40.     The c_user cookie is personally identifiable information because it contains a consumer's unencrypted Facebook ID.  A Facebook ID allows *anybody*—not just Facebook—to identify the individual NBA Top Shot NFT purchaser with a Facebook account.  If one types www.facebook.com/[FacebookID] a into web browser, it will load that individual's Facebook page.  For example, the c_user cookie in Figures 12-14 is 1528550551, and www.facebook.com/1528550551 leads to the undersigned's Facebook page.

41.     The Meta Tracking Pixel transmits additional cookies to Meta.

42.     The fr cookie contains, at least, an encrypted Facebook ID and browser identifier.[31] Facebook, at a minimum, uses the fr cookie to identify particular users.[32]

43.     Without a corresponding Facebook ID, the fr cookie contains, at least, an abbreviated and encrypted value that identifies the browser.  Facebook uses this for targeted advertising.

44.     The Meta Tracking Pixel uses both first- and third-party cookies.  A first-party cookie is "created by the website the user is visiting"—*i.e.*, nbatopshot.com.[33]  A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—*i.e.*, Facebook.[34]

---

[31] Data Protection Commissioner, Facebook Ireland Ltd, Report of Re-Audit (Sept. 21, 2012),  http://www.europe-v-facebook.org/ODPC_Review.pdf.

[32] Facebook, Cookies & other storage technologies, https://www.facebook.com/policy/cookies/.

[33] PC Mag, first-party cookies, https://www.pcmag.com/encyclopedia/term/first-party-cookie. This is confirmable by using developer tools to inspect a website's cookies and track network activity.

[34] PC Mag, Third-party cookies, https://www.pcmag.com/encyclopedia/term/third-party-cookie. This is also confirmable by tracking network activity.

45.     Meta, at a minimum, uses the fr and c_user cookies to link to Facebook IDs and corresponding Facebook profiles.

46.     A Facebook ID is personally identifiable information.  Anyone can identify a Facebook profile—and all personal information publicly listed on that profile—by appending the Facebook ID to the end of https://facebook.com.

47.     Through the Meta Tracking Pixel's code, these cookies combine the identifiers with the event data, allowing Meta to know, among other things, what nbatopshot.com video clips a user has requested and obtained, and when they have purchased an NFT.[35]

48.     Defendants disclose these identifiers so Meta can match them with a corresponding Facebook profile and link it to a subscriber's subsequent activity on nbatopshot.com.

49.     By compelling a visitor's browser to disclose the c_user and fr cookies alongside event data for videos and video clip NFT purchases, Defendants knowingly disclose information sufficiently permitting an ordinary person to identify a specific individual's video viewing behavior.

50.     Meta confirms that it matches activity on nbatopshot.com with a user's profile. Meta allows users to download their "off-site activity," which is a "summary of activity that businesses and organizations share with us about your interactions, such as visiting their apps or websites."[36]  The off-site activity report confirms Meta identifies an individual's video viewing activities.

---

[35] FACEBOOK, GET STARTED, https://developers.facebook.com/docs/meta-pixel/get-started.

[36] FACEBOOK, WHAT IS OFF-FACEBOOK ACTIVITY?, https://www.facebook.com/help/2207256696182627.  As discussed there, the Off-Facebook Activity is only a "summary" and Facebook acknowledges "receiv[ing] more details and activity than what appears in your Facebook activity."  What is more, it omits "information we've received when you're not logged into Facebook, or when we can't confirm that you've previously used Facebook on that device."



**Figure 15**

51.     Moreover, Defendants never obtained NBA Top Shot users' informed written consent to share this private information with Facebook.

52.     The VPPA only permits video tape service providers like Defendants to disclose a consumers' personally identifiable information if they obtain consumers' "informed, written consent," beforehand, which gives consumers "an opportunity, in a clear and conspicuous manner, for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election."  18 U.S.C. §2710(b)(2)(B).

**D.      Experience of Plaintiff**

53.     In or around December 2021, Plaintiff Fan purchased a NBA Top Shot video clip NFT on nbatopshot.com.

54.     Prior to this purchase, he had created both a Facebook account and NBA Top Shot account.

55.     When Plaintiff Fan watched and purchased video clips on nbatopshot.com, Defendants disclosed his event data, which recorded and disclosed the video's title, URL, and video description to Meta.  Alongside this event data, Defendants also disclosed identifiers for Plaintiff Fan including the c_user and fr cookies to Meta.

56.     By disclosing his event data and identifiers, Defendants disclosed Plaintiff Fan's personally identifiable information to a third-party, Meta.

57.     Plaintiff Fan discovered that Defendants surreptitiously collected and transmitted his personally identifiable information in September 2023.

## CLASS ALLEGATIONS

58.     **Class Definition**: Plaintiff seeks to represent a class of similarly situated individuals defined as all persons in the United States who have Facebook and nbatopshot.com accounts, and viewed or purchased video clips on nbatopshot.com (the "Class") on or after October 3, 2023.

59.     **California Subclass**: Plaintiff seeks to represent a class of similarly situated individuals defined as all persons in the state of California who have Facebook and nbatopshot.com accounts, and viewed or purchased video clips on nbatopshot.com (the "Class") on or after October 3, 2021.

60.     **Numerosity (Fed. R. Civ. P. 23(a)(1))**:  At this time, Plaintiff does not know the exact number of members of the aforementioned Class and Subclass.  However, given the popularity of Defendants' website, the number of persons within the Class and Subclass is believed to be so numerous that joinder of all members is impractical.

61.     **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2), 23(b)(3))**:  There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class and Subclasses that predominate over questions that may affect individual members of the Class and California Subclass include:

(a)     whether Defendants collected Plaintiff's and the Class's PII;

(b)     whether Defendants unlawfully disclosed and continue to disclose its users' PII in violation of the VPPA;

(c)     whether Defendants' disclosures were committed knowingly;

(d)     whether Defendants disclosed Plaintiff's and the Class's PII without consent; and

(e)     whether Defendants' conduct violates California Civil Code § 1799.3.

62.     **Typicality (Fed. R. Civ. P. 23(a)(3))**:  Plaintiff's claims are typical of those of the Class because Plaintiff, like all members of the Class and Subclasses, used nbatopshot.com to watch videos, and had his PII collected and disclosed by Defendant, and had his communications recorded by Defendant, without his consent.

63.     **Adequacy (Fed. R. Civ. P. 23(a)(4))**: Plaintiff has retained and is represented by qualified and competent counsel who are highly experienced in complex consumer class action litigation, including litigation concerning the VPPA.  Plaintiff and his counsel are committed to vigorously prosecuting this class action.  Moreover, Plaintiff is able to fairly and adequately represent and protect the interests of the Class.  Neither Plaintiff nor their counsel have any interest adverse to, or in conflict with, the interests of the absent members of the Class.  Plaintiff has raised viable statutory claims of the type reasonably expected to be raised by members of the Class and Subclasses, and will vigorously pursue those claims.  If necessary, Plaintiff may seek leave of this Court to amend this Class Action Complaint to include additional representatives to represent the Class and Subclasses, additional claims as may be appropriate, or to amend the definition of the Class and Subclasses to address any steps that Defendants may take.

64.     **Superiority (Fed. R. Civ. P. 23(b)(3))**:  A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Class and Subclasses is impracticable.  Even if every member of the Class and Subclasses could afford to pursue individual litigation, the court system could not.  It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.  Individualized litigation would also present the potential for varying, inconsistent or contradictory judgments, and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues.  By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system and protects the rights of each member of the Class and Subclasses.  Plaintiff anticipates no difficulty in the management of this action as a class action.

**CAUSES OF ACTION**
**COUNT I**
**Violation of the Video Privacy Protection Act**
**18 U.S.C. § 2710, *et seq.***

65.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

66.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendants.

67.     Defendants are "video tape service provider[s]" because they create, host, deliver, and sell thousands of videos on their website, thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials."  18 U.S.C. § 2710(a)(4).

68.     Plaintiff and members of the Class are "consumers" because they have accounts with nbatopshot.com and purchase video clips from nbatopshot.com.  18 U.S.C. § 2710(a)(1).

69.     Defendants disclosed to a third party, Meta, Plaintiff and the Class members' personally identifiable information.  Defendants utilized the Meta Tracking Pixel to compel Plaintiff's web browser to transfer Plaintiff's identifying information, like their Facebook ID, along with Plaintiff's event data, like the title of the videos they viewed and purchased.

70.     Plaintiff and the Class members viewed and purchased videos using nbatopshot.com.

71.     Defendants knowingly disclosed Plaintiff and Class members' PII because they used that data to build audiences on Meta and retarget Plaintiff and Class members for Defendants' advertising campaigns.

72.     Plaintiff and Class members did not provide Defendants with any form of consent—either written or otherwise—to disclose their PII to third parties.

73.     Nor were Defendants' disclosures made in the "ordinary course of business" as the term is defined by the VPPA.  In particular, Defendants' disclosures to Meta were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership."  18 U.S.C. § 2710(a)(2).

74.     On behalf of himself and the Class, Plaintiff seeks: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by requiring Defendants to comply with VPPA's requirements for protecting a consumer's PII; (iii) statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c); and (iv) reasonable attorneys' fees and costs and other litigation expenses.

<u>**COUNT II**</u>
**Violation of California Civil Code § 1799.3**

75.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

76.     Plaintiff brings this claim individually and on behalf of the members of the proposed California Subclass against Defendants.

77.     Cal. Civ. Code § 1799.3(a) prohibits a "person providing video recording sales … services" from disclosing "any personal information or the contents of any record, including sales or rental information, which is prepared or maintained by that person, to any person, other than the individual who is the subject of the record, without the written consent of that individual."

78.     Defendants are "person[s] providing video recording sales … services" because they sell ownership of recorded video clips through their website, nbatopshot.com.  Defendants also provide a platform for third-parties to sell their video clips to other purchases, also through their website, nbatopshot.com.

79.     Defendants disclosed to a third party, Meta, Plaintiff and California Subclass members' personal information.  Defendants utilized the Meta Tracking Pixel to compel Plaintiff's web browser to transfer Plaintiff's identifying information, like his Facebook ID, along with Plaintiff's event data, like the title of the videos he viewed and purchased.

80.     Plaintiff and the California Subclass members viewed and purchased videos using nbatopshot.com.

81.     Defendants willfully disclosed Plaintiff and the California Subclass members' PII because Defendants used that data to build audiences on Facebook and retarget Plaintiff and the California Subclass members for Defendants' advertising campaigns.

82.     Plaintiff and California Subclass members did not provide Defendants with any form of consent—either written or otherwise—to disclose their PII to third parties.

83.     On behalf of himself and the California Subclass, Plaintiff seeks: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the California Subclass by requiring Defendants to comply with Cal. Civ. Code § 1799.3's requirements for protecting a consumer's PII; (iii) statutory damages of $500 for each violation of this law pursuant to Cal. Civ. Code § 1799.3(c); and (iv) reasonable attorneys' fees and costs and other litigation expenses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks a judgment against Defendant, individually and on behalf of all others similarly situated, as follows:

(a)     For an order certifying the Class and the California Subclass under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as representative of the Class and California Subclass, and naming Plaintiff's attorneys as Class Counsel to represent the Class and the California Subclass;

(b)     For an order declaring that Defendants' conduct violates the statutes referenced herein;

(c)     For an order finding in favor of Plaintiff and the Class and the California Subclass on all counts asserted herein;

(d)     An award of statutory damages to the extent available;

(e)     For punitive damages, as warranted, in an amount to be determined at trial;

(f)     For prejudgment interest on all amounts awarded;

(g)     For injunctive relief as pleaded or as the Court may deem proper; and

(h)     For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all claims so triable.

1

Dated:  October 3, 2023

**BURSOR & FISHER, P.A**.

2

By:  ___*/s/ Stefan Bogdanovich*_____

3

Stefan Bogdanovich

4

L. Timothy Fisher (State Bar No. 191626)

5

Stefan Bogdanovich (State Bar No. 324525)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596

6

Telephone: (925) 300-4455
Facsimile:  (925) 407-2700

7

E-mail: ltfisher@bursor.com
          sbogdanovich@bursor.com

8

Christopher R. Reilly (*pro hac vice application forthcoming*)

9

701 Brickell Avenue, Suite 1420
Miami, FL 33131

10

Telephone: (305) 330-5512
Facsimile:  (305) 676-9006

11

Email: creilly@bursor.com

12

*Attorneys for Plaintiff*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28