**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Stefan Bogdanovich (State Bar No. 324525)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com
         sbogdanovich@bursor.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMAS FAN, MATTHEW KIMOTO, and CLINTON BROWN, on behalf of themselves and all others similarly situated,<br><br>                    Plaintiffs,<br><br>         v.<br><br>NBA PROPERTIES, INC., and DAPPER LABS, INC.,<br><br>                    Defendants. | Case No. 3:23-cv-05069-SI<br><br>**THIRD AMENDED CLASS ACTION COMPLAINT**<br><br><u>JURY TRIAL DEMANDED</u> |

# REDACTED VERSION

1    Plaintiffs Thomas Fan, Matthew Kimoto, and Clinton Brown ("Plaintiffs"), individually

2    and on behalf of all other persons similarly situated, by and through their attorneys, make the

3    following allegations pursuant to the investigation of their counsel and based upon information and

4    belief, except as to allegations specifically pertaining to themselves and their counsel, which are

5    based on personal knowledge.

6                                        **NATURE OF THE ACTION**

7    1.    This is a class action suit brought against Defendants NBA Properties, Inc.

8    ("NBA"), and Dapper Labs, Inc. ("Dapper Labs") for violating the Video Privacy Protect Act

9    ("VPPA") by collecting and sharing highly sensitive and specific information about basketball

10   fans' video consumption habits without their informed written consent.

11   2.    NBA Top Shot is an unincorporated joint venture or partnership created by the

12   Defendants to sell blockchain "moments" to basketball fans around the world.[1]  These moments

13   can probably best be described as 21st Century trading cards, which allow fans to own specific pre-

14   recorded video clips of their favorite NBA players performing highlight-worthy plays.[2]  And just

15   like many trading cards, these NBA Top Shot pre-recorded video clips are minted, numbered, and

16   released in limited quantities to make them collectible.[3]  However, unlike physical, tangible,

17   trading cards, these NBA Top Shot video clips are owned through digital non-fungible tokens

18   ("NFTs"), and data about the ownership of each pre-recorded video clip is stored on a ***private***

19   blockchain.[4]

20

21   _____

[1] NBA COMMUNICATIONS, *NBA, NBPA and Dapper Labs bring first-of-its-kind blockchain
22   game to basketball fans around the globe*, (July 31, 2019), https://pr.nba.com/nba-nbpa-dapper-labs-blockchain-game/.

23   [2] *Id*.

24   [3] For example, NBA Top Shot minted 32 video clips of Magic Johnson's legendary baby sky hook
     to win Game 4 of the 1987 Finals against the Boston Celtics, and each of these clips have sold for
25   several thousands of dollars. *See* https://nbatopshot.com/listings/p2p/6d9f3306-7ced-41d7-bb87-3d2a12a0e97a+14b537fd-991f-4444-b878-5dd224999b85?utm_source=setpage&utm_medium=moment&utm_campaign=setpage.

26   [4] "In simplest terms, a 'blockchain' is a decentralized digital ledger used to record and validate
     transactions… Blockchains may be either public, like that underlying perhaps its most famous use-
27   case, Bitcoin, or private, like Dapper Labs's Flow Blockchain.  While generally associated with the
     transfer of digital currencies (often called cryptocurrencies, or crypto for short), blockchains can be
28   used not only to store information about the transfer of the currency but can also be applied to

3.      NBA Top Shot generates random and ***anonymous*** usernames for basketball fans to buy and sell these video clips.  When a fan purchases a video clip, they receive a virtual non-fungible token ("NFT"), and NBA Top Shot records the transaction by adding their anonymous username to the public, online ledger.  This allows anyone with access to the internet to verify which username owns which video clip.  One of the main appeals of blockchain technology like this is that it allows anyone to verify the ownership of an asset while simultaneously keeping the owner's identity anonymous.[5]

4.      Except, in the case of NBA Top Shot moments, the owners' identities are neither kept anonymous nor private.  NBA Top Shot discloses personally identifiable information ("PII")—including a record of every video consumed by Plaintiffs and class members—to unrelated third parties without their informed written consent.  NBA Top Shot installed computer code on its website, called the "Meta Tracking Pixel," which tracks and records Plaintiffs' and Class members' private video consumption.  Behind the scenes of the webpages where Plaintiffs and Class members can purchase video clips—and unbeknownst to video viewers—this code collects Plaintiffs' and Class members' transaction history and discloses it to Meta Platforms, Inc. ("Meta" or "Facebook")—***completely separately from the blockchain***.  Meta, in turn, uses Plaintiffs' and Class members' video consumption habits to deliver targeted advertisements to them.

5.      Defendants' disclosures violated the VPPA.  The VPPA was meant to give consumers the power to "maintain control over personal information divulged and generated in exchange for receiving services from video tape service providers."  S. Rep. No. 100-599, at 8.  "The Act reflects the central principle of the Privacy Act of 1974: that information collected for one purpose may not be used for a different purpose without the individual's consent."  *Id.*

---

record ownership of a wide variety of more traditional assets, like stocks and bonds."  *Friel v. Dapper Labs, Inc*., No. 21 CIV. 5837 (VM), 2023 WL 2162747, at *2 (S.D.N.Y. Feb. 22, 2023).

[5] MEDIUM, *The Basics of Blockchain Privacy: How to Remain Anonymous on the Blockchain* (Aug. 3, 2022), https://medium.com/coinmonks/the-basics-of-blockchain-privacy-how-to-remain-anonymous-on-the-blockchain-3f1cef44ad63.

**PARTIES**

6.    Plaintiff Thomas Fan is, and has been at all relevant times, a citizen of California who resides in Contra Costa County, California.

7.    Plaintiff Matthew Kimoto is, and has been at all relevant times, a citizen of California who resides in San Francisco County, California.

8.    Plaintiff Clinton Brown, is, and has been at all relevant times, a citizen of California who resides in Sacramento County, California.

9.    Defendant NBA Properties Inc. is a New York Corporation with its principal place of business at 645 Fifth Ave., New York City, New York, United States.  Defendant NBA Properties Inc. is a partner in the NBA Top Shot enterprise, which sells its blockchain video clips throughout California and the United States.

10.    Defendant Dapper Labs, Inc. is a Canadian corporation with its principal place of business at 565 Great Northern Way #600, Vancouver, British Columbia, Canada, V5T0H8. Defendant Dapper Labs, Inc. is a partner in the NBA Top Shot Enterprise, which sells its blockchain video clips throughout California and the United States.

**JURISDICTION AND VENUE**

11.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (*i.e.*, the VPPA).  This Court also has supplemental jurisdiction over the California state claim because it arises from the same transactions and occurrences.  This Court also has jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. §§ 1332(a), 1332(d)(2).  The amount in controversy exceeds $5,000,000, exclusive of interest and costs, and there are more than 100 members of the Class and the California Subclass, and there is minimal diversity.

12.    This Court has personal jurisdiction over Defendants because they conduct substantial business within California, including (1) the sale, marketing, and advertising of NBA Top Shot NFTs to California consumers, (2) the collection of private information from Californian basketball fans, and (3) the disclosure of every NBA Top Shot NFT owner's private information to

a California corporation, Meta Platforms, Inc.  Furthermore, a substantial portion of the events giving rise to Plaintiffs' claims occurred in this state.

13.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District.

<u>FACTUAL BACKGROUND</u>

**A.    The VPPA**

14.    The origins of the VPPA begin with President Ronald Reagan's nomination of Judge Robert Bork to the United States Supreme Court.  During the confirmation process, a movie rental store disclosed the nominee's rental history to the Washington City Paper, which was then published.  With an eye toward the digital future, Congress responded by passing the VPPA.  As Senator Patrick Leahy, who introduced the Act, explained:

> It is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home.  In an area of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the people they telephone.  I think that is wrong.

S. Rep. 100-599, at 5-6 (internal ellipses and brackets omitted).

15.    The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider."  18 U.S.C. § 2710(b)(1).  The VPPA defines personally identifiable information as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider."  18 U.S.C. § 2710(a)(3).  A video tape service provider is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials."  18 U.S.C. § 2710(a)(4).

**B.    The Meta Tracking Pixel**

16.    Facebook is the largest social networking site on the planet, touting 2.9 billion

monthly active users.[6]  Facebook describes itself as a "real identity platform,"[7] meaning users are allowed only one account and must share "the name they go by in everyday life."[8]  To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[9]

17.    Meta owns facebook.com and generates revenue by selling advertising space on Facebook, and other applications it owns, like Instagram.[10]

18.    Meta sells advertising space by highlighting its ability to target users.[11]  Meta can target users so effectively because it surveils user activity both on and *off its site*.[12]  This allows Meta to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[13]  Meta compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[14]

19.    Advertisers can also build "Custom Audiences."[15]  Custom Audiences enable advertisers to reach "people who have already shown interest in [their] business, whether they're

---

[6] Sean Burch, *Facebook Climbs to 2.9 Billion Users, Report 29.1 Billion in Q2 Sales*, YAHOO (July 28, 2021), https://www.yahoo.com/now/facebook-climbs-2-9-billion-202044267.html

[7] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).

[8] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.

[9] FACEBOOK, SIGN UP, https://www.facebook.com/

[10] Mike Isaac, *Facebook's profit surges 101 percent on strong ad sales.*, N.Y. TIMES (July 28, 2021), https://www.nytimes.com/2021/07/28/business/facebook-q2-earnings.html.

[11] FACEBOOK, WHY ADVERTISE ON FACEBOOK, https://www.facebook.com/business/help/205029060038706.

[12] FACEBOOK, ABOUT FACEBOOK PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[13] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[14] FACEBOOK, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK, https://www.facebook.com/business/news/Core-Audiences.

[15] FACEBOOK, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227?id=2469097953376494.

loyal customers or people who have used [their] app or visited [their] website."[16]  Advertisers can use a Custom Audience to target existing customers directly, or they can use it to build "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[17]  Unlike Core Audiences, Custom Audiences require an advertiser to supply the underlying data to Meta.  They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Facebook's "Business Tools," which collect and transmit the data automatically.[18]  One such Business Tool is the Meta Tracking Pixel.

20.      The Meta Tracking Pixel is a piece of code that advertisers, like Defendants, can integrate into their websites.  Once activated, the Meta Tracking Pixel "tracks the people and type of actions they take."[19]  When the Meta Tracking Pixel captures an action, it sends a record to Facebook.  Once this record is received, Meta processes it, analyzes it, and assimilates it into datasets like the Core Audiences and Custom Audiences.

21.      Advertisers control what actions—or, as Meta calls it, "events"—the Meta Tracking Pixel will collect, including the website's metadata, along with what pages a visitor views.[20] Advertisers can also configure the Meta Tracking Pixel to track other events.  Meta offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or

---

[16] FACEBOOK, ABOUT EVENTS CUSTOM AUDIENCE, https://www.facebook.com/business/help/366151833804507?id=300360584271273.

[17] FACEBOOK, ABOUT LOOKALIKE AUDIENCES, https://www.facebook.com/business/help/164749007013531?id=401668390442328.

[18] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE, https://www.facebook.com/business/help/170456843145568?id=2469097953376494; FACEBOOK, CREATE A WEBSITE CUSTOM AUDIENCE, https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.

[19] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.

[20] See FACEBOOK, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED, https://developers.facebook.com/docs/facebook-pixel/advanced/; see also FACEBOOK, BEST PRACTICES FOR FACEBOOK PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142.

1   purchases.[21]  An advertiser can also create their own tracking parameters by building a "custom

2   event."[22]

3       22.    Advertisers control how the Meta Tracking Pixel identifies visitors.  The Meta

4   Tracking Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific Data."[23]

5   HTTP Headers collect "IP addresses, information about the web browser, page location, document,

6   referrer and persons using the website."[24]  Pixel-specific Data includes "the Pixel ID and cookie."[25]

7       **C.    NBA Top Shot and the Meta Pixel**

8       23.    NBA Top Shot operates the nbatopshot.com website.  The website contains the full

9   universe of NBA Top Shot "moments" that users can buy, sell, and trade on the website.

10      24.    NBA Top Shot "moments" are pre-recorded video clips of various past and present

11  NBA players performing highlight-worthy plays—like dunks, blocks, assists, or game-winning

12  jump shots.[26]  These video clips contain sound and can play on continuous repeat.[27]  Anyone can

13  publicly view a video clip on the NBA Top Shot website, but only certain individuals can own a

14  particular video clip.  Just like many physical sports trading cards, these video clips are minted,

15  numbered, and released in limited quantities to make them collectible.

16      25.    Ownership of these NBA Top Shot video clips can be transferred through digital

17  non-fungible tokens ("NFTs").  NFTs are digital assets whose authenticity and ownership can be

18  recorded on a private blockchain.  Blockchains are digital ledgers used to record transactions.  One

19  of the main appeals of blockchain technology is that, through the use of a private blockchain,

---

[21] FACEBOOK, SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS,
https://www.facebook.com/business/help/402791146561655?id=1205376682832142.

[22] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS,
https://www.facebook.com/business/help/964258670337005?id=1205376682832142.

[23] FACEBOOK, FACEBOOK PIXEL, https://developers.facebook.com/docs/facebook-pixel/.

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] *See, e.g.,* https://nbatopshot.com/listings/p2p/733bdf78-8ce0-4992-aa78-
bd08c2746907+69ad0965-e3fd-43ad-800e-
bc2830858030?utm_source=playerpage&utm_medium=moment&utm_campaign=playerpage.

anyone can verify the ownership of an asset while simultaneously keeping the owner's identity anonymous.[28]

26.     The ownership of a particular NBA Top Shot video clip is linked to a particular NFT.  So, for example, Defendants have minted 75 video clips of the basketball player Giannis Antetokoumpo performing highlights during a February 6, 2018 game against the New York Knicks.[29]  For these particular video clips, Defendants have created 75 unique NFTs bearing 75 unique serial numbers.  Only one NFT exists with a particular serial number, and only one NFT is linked to one video clip.  This makes each individual NBA Top Shot video clip unique.

27.     For the Giannis Antetokoumpo video clips mentioned above, the NBA Top Shot website provides, as of 6:01 p.m. PST September 28, 2023, that of these 75 NFTs, 10 were for listed for sale, 53 were owned but not for sale, and 12 were "hidden in packs."  *See* Figure 1, below.  Packs of video clips can be purchased from Defendants' website and will include a random assortment of video clips.  This is akin to packs for sports trading cards, which can also include a random assortment of cards.  The NBA Top Shot video clips, once owned, can also be burned, so that they can never be in circulation again.  This is akin to physically destroying a trading card.



**Figure 1**

[28] MEDIUM, *The Basics of Blockchain Privacy: How to Remain Anonymous on the Blockchain* (Aug. 3, 2022), https://medium.com/coinmonks/the-basics-of-blockchain-privacy-how-to-remain-anonymous-on-the-blockchain-3f1cef44ad63.

[29] https://nbatopshot.com/listings/p2p/733bdf78-8ce0-4992-aa78-bd08c2746907+9668dd1e-619f-4936-8f3b-33e67bbf4108?utm_source=setpage&utm_medium=moment&utm_campaign=setpage.

28.     The ownership of each unique NBA Top Shot NFT is recorded on a private blockchain—the "Flow Blockchain," which only Defendant Dapper Labs, Inc. has full access to.

29.     To purchase a particular video clip, Defendants require basketball fans and collectors to create an account with Defendant Dapper Labs, Inc. and to create a secret password to access this account.  Often times, fans and collectors are induced to sign up by the promise of a "free" pack of video clip(s).  *See* Figure 2.



**Figure 2**

30.     Once a basketball fan or collector signs up for an account, the NBA Top Shot website generates a random and ***anonymous*** username for that individual and thereby becomes a "user."  For example, when the undersigned created an account for purposes of drafting this complaint, the NBA Top Shot website assigned him with the username "biodegradable_fur_seal9104."  If that user then purchases a video clip, his or her random and anonymous username is recorded on the Flow Blockchain, along with the NFT that was purchased.

31.    Defendants publicly post on the NBA Top Shot website the usernames of the owners of particular video clips that are listed for sale.



**Figure 3**

32.    However, Defendants do not publicly disclose the real-world identities of these users.  Users are able to keep their real-world identities hidden and anonymous with the random usernames generated by Defendants on the NBA Top Shot website.

33.    Unknown to NBA Top Shot users, however, NBA Top Shot also passes users' video consumption histories ***and*** their real-world identities to Meta.

34.    The nbatopshot.com website hosts the Meta Tracking Pixel.  On webpages containing video clips, nbatopshot.com transmits four distinct events to Meta via the Meta Tracking Pixel: "Microdata," "ViewContent," "PageView," and "Button Click."  *See* Figure 4, next page.  Microdata tells Meta the "title" of the specific video clip the NBA Top Shot user has requested or obtained, along with a description of the video.  *See* Figure 5, next page. ViewContent and PageView, on the other hand, tell Meta the URL of the webpage.  A URL allows any ordinary person to figure out which specific video clip the user has obtained and may have requested.  *See* Figure 6, next page.



**Figure 4**

**Figure 5**

**Figure 6**

35.     The first three events, "ViewContent," "PageView,"and "Microdata,"

independently, permit an ordinary person to identify a video's content and title.

36.     The Fourth "Button Click" event tells Meta if and exactly when a user clicks on a

clickable element on the webpage.  If a particular NBA Top Shot user clicks the "SELECT AND

BUY" button in Figure 4, the "ButtonClick" event discloses to Meta the text of that button.  After a

user clicks "SELECT AND BUY," he or she is presented with a number of NFTs he or she can

choose from, along with the NFTs' prices, owners, and serial numbers.



**Figure 7**

37.     If a user clicks on a particular moment, and clicks the "BUY FOR $[cost of NFT]"

button, they are taken to a payment page and three new events are sent to Meta, "ButtonClick,"

"P2PMomentPurchase," and "Purchase."  *See* Figure 8, next page.



**Figure 8**

38.    The ButtonClick event includes the "buttonText" custom parameter that discloses to Meta the "BUY FOR $0"[30] on the button from the previous page.  The ButtonClick event also includes the title of the NFT in the "pageFeatures" custom parameter.  Additionally, all three of the events in Figure 8—a"P2PMomentsPurchase," "Purchase," and "ButtonClick"—include the URL of the previous page.  *See* Figure 9.



**Figure 9**

---

[30] Regardless of the price of the particular video clip NFT in Figure 7, the buttonText transmitted to Meta says "$0."  For example, in Figure 7, the price of the NFT is $10, but it still states $0 in the buttonText.

1

2     39.     If a user thereafter inputs their payment information, and clicks "Pay with credit

3     card," they are redirected to a receipt page.  *See* Figure 10.  The Microdata event on that page

4     discloses to Meta that a user has a receipt for this purchase.  *See* Figure 11.

5



**Figure 10**



**Figure 11**

25     40.     When a visitor purchases a video clip NFT while logged into Facebook, the NBA

26    Top Shot website compels a visitor's browser to transmit an identifying "computer cookie" to Meta

27    called "c_user," for every single event sent through the Meta Tracking Pixel.  The c_user cookie

28    contains that visitor's unencrypted Facebook ID.  When a user purchased the above video clip, for

example, the NBA Top Shot website compelled the browser to send cookies to Meta, as shown

through a browser's developer tools. *See, e.g.,*  Figures 12-14, below.



**Figure 12**

▼ Request Headers

:authority:        www.facebook.com
:method:           GET
:path:             /tr/?
                   id=734566633667278&ev=PageView&dl=https%3A%2F%2Fnbatopshot.com%2Forder%2Fmo
                   ment-purchase%2Ff9947dec-e2b1-49ad-97e2-
                   7fb8f4bdec00%3FisFromPurchase%3Dtrue%26isFromOnboarding%3Dfalse%26requestID%3D
                   p2p%253A88ef52f7-74ff-4ba5-b4df-
                   9ebdf544a2c4%26status%3Dtx_submitted&rl=https%3A%2F%2Faccounts.meetdapper.com%2
                   F&if=false&ts=1696262029537&sw=1920&sh=1080&v=2.9.131&r=stable&ec=0&o=30&fbp
                   =fb.1.1695944453731.2803166&cs_est=true&ler=other&it=1696262029207&coo=false&exp
                   =0&rqm=GET
:scheme:           https
Accept:            image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8
Accept-Encoding:   gzip, deflate, br
Accept-Language:   en-US,en;q=0.9
Cookie:            datr=IKMTZDnp92T5Bkqwh2LEBedt; sb=FXEXZF66qmf7QYrBRI0wetuo; c_user=1528550551;
                   m_ls=%7B%22c%22%3A%7B%221%22%3A%22HCwAABbUsgsWvvuNyAITBBau0t6xCwA%22%
                   2C%222%22%3A%22GSwVQ8xMAAAWAhbY-aPEDBYAABV-
                   HEwAABYAFtz5o8QMFgAAFigA%22%7D%2C%22d%22%3A%22822a51d5-e4f0-4dd6-a85d-
                   c9f57f0367b8%22%2C%22s%22%3A%220%22%2C%22u%22%3A%226riktz%22%7D;
                   xs=24%3ATWFeKjQ4G0FB5A%3A2%3A1679257972%3A-
                   1%3A2280%3A%3AAcUZEiQ7N8_vT7QJjPuRdjc3cseRFnF-nFDYMeOdagl;
                   fr=0V08k3uWHNa4OFcGj.AWUQC5ePOwhboLfW0YKneJrp6zQ.BlFgye.WQ.AAA.0.0.BlFgye.AWV
                   fMjBAQXM
Referer:           https://nbatopshot.com/

**Figure 13**

| Request Cookies | ☐ show filtered out request cookies | |
| --- | --- | --- |
| Name | Value | Domain |
| datr | IKMTZDnp92T5Bkqwh2LEBedt | .facebook.com |
| sb | FXEXZF66qmf7QYrBRI0wetan | .facebook.com |
| c_user | 1528550551 | .facebook.com |
| m_ls | %7B%22c%22%3A%7B%221%22%3A%22HCwAABbUsgsWvvuNyAlTBBau0t6xC... | .www.facebook.com |
| xs | 24%3ATWFeKjQ4G0FB5A%3A2%3A1679257972%3A-1%3A2280%3A%3AAcUZEi... | .facebook.com |
| fr | 0V08k3uWHNa4OFcGj.AWUQC5ePOwhboLfW0YKneJrp6zQ.BlFgye.WQ.AAA.0.0.... | .facebook.com |

**Figure 14**

41.    The c_user cookie is personally identifiable information because it contains a consumer's unencrypted Facebook ID.  A Facebook ID allows *anybody*—not just Facebook—to identify the individual NBA Top Shot NFT purchaser with a Facebook account.  If one types www.facebook.com/[FacebookID] a into web browser, it will load that individual's Facebook page.  For example, the c_user cookie in Figures 12-14 is 1528550551, and www.facebook.com/1528550551 leads to the undersigned's Facebook page.

42.    The Meta Tracking Pixel transmits additional cookies to Meta.

43.    The fr cookie contains, at least, an encrypted Facebook ID and browser identifier.[31]  Facebook, at a minimum, uses the fr cookie to identify particular users.[32]

44.    Without a corresponding Facebook ID, the fr cookie contains, at least, an abbreviated and encrypted value that identifies the browser.  Facebook uses this for targeted advertising.

45.    The Meta Tracking Pixel uses both first- and third-party cookies.  A first-party cookie is "created by the website the user is visiting"—*i.e.*, nbatopshot.com.[33]  A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—*i.e.*, Facebook.[34]

---

[31] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012),  http://www.europe-v-facebook.org/ODPC_Review.pdf.

[32] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[33] PC MAG, FIRST-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/first-party-cookie. This is confirmable by using developer tools to inspect a website's cookies and track network activity.

[34] PC MAG, THIRD-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/third-party-cookie. This is also confirmable by tracking network activity.

46.     Meta, at a minimum, uses the fr and c_user cookies to link the Facebook IDs with their corresponding Facebook profiles.

47.     A Facebook ID is personally identifiable information.  Anyone can identify a Facebook profile—and all personal information publicly listed on that profile—by appending the Facebook ID to the end of https://facebook.com.

48.     Through the Meta Tracking Pixel's code, these cookies combine the identifiers with the event data, allowing Meta to know, among other things, what nbatopshot.com video clips a particular individual has requested and obtained, and when they have purchased an NFT.[35]

49.     Defendants disclose these identifiers so Meta can match them with a corresponding Facebook profile and link it to that person's subsequent activity on nbatopshot.com.

50.     By compelling a visitor's browser to disclose the c_user and fr cookies alongside event data for videos and video clip NFT purchases, Defendants knowingly disclose information sufficiently permitting an ordinary person to identify a specific individual's video viewing behavior.

51.     Meta confirms that it matches activity on nbatopshot.com with a user's profile. Meta allows users to download their "off-site activity," which is a "summary of activity that businesses and organizations share with us about your interactions, such as visiting their apps or websites."[36]  The off-site activity report confirms Meta identifies an individual's video viewing activities.  *See* Figure 15, reproduced on the following page.

---

[35] FACEBOOK, GET STARTED, https://developers.facebook.com/docs/meta-pixel/get-started.

[36] FACEBOOK, WHAT IS OFF-FACEBOOK ACTIVITY?, https://www.facebook.com/help/2207256696182627.  As discussed there, the Off-Facebook Activity is only a "summary" and Facebook acknowledges "receiv[ing] more details and activity than what appears in your Facebook activity."  What is more, it omits "information we've received when you're not logged into Facebook, or when we can't confirm that you've previously used Facebook on that device."



**Figure 15**

52.    Moreover, Defendants never obtained NBA Top Shot users' informed written consent to share this private information with Facebook.

53.    The VPPA only permits video tape service providers like Defendants to disclose a consumer's personally identifiable information if they obtain the consumer's "informed, written consent," beforehand, which gives the consumer "an opportunity, in a clear and conspicuous manner… to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election."  18 U.S.C. §2710(b)(2)(B).

**D.    Enterprise Allegations**

<u>Intent of the Parties</u>

54.    From the jump, the NBA and Dapper publicly expressed their intent to be partners in the NBA Top Shot Enterprise.  In the NBA's very first press release for NBA Top Shot, the NBA's Senior Director, Adrienne O'Keeffe, said "Dapper Labs' innovation and expertise make them a <u>perfect partner</u> to introduce this groundbreaking game and what we believe will become coveted digital collectibles for basketball fans around the world."[37]  The feeling was mutual.

---

[37] NBA COMMUNICATIONS, *NBA, NBPA and Dapper Labs bring first-of-its-kind blockchain game to basketball fans around the globe*, (July 31, 2019), https://pr.nba.com/nba-nbpa-dapper-labs-blockchain-game/.

Roham Gharegozlou, CEO of Dapper, said he "is proud to <u>work with the NBA</u> … to create an unparalleled digital experience for sports fans." *Id.* (emphasis added).[38]

55.    Thereafter, Dapper's CEO, Roham Gharegozlou, and the NBA commissioner Adam Silver sat down to publicly discuss NBA Top Shot for nearly an hour at NBA Con 2023.[39]  Mr. Gharegozlou said, "I think the [way the] NBA interacts with startups and technology companies is different … the NBA has been with us as <u>a partner</u> has also helped us think innovatively and also think big and be sustainable."[40]  NBA Commissioner Adam Silver agreed, saying: "What I love about these <u>partnerships</u> is the combination of these real moments.  <u>It's not some virtual world: it's the NBA.</u>"[41]  He added that "what was so attractive to us about Top Shot is that the way to truly scale is through digital products."[42]  "With what sophisticated companies like Dapper Labs can do with [these moments] is what makes me so excited."[43]

56.    ███████████████████████████████████████████
███████████████████████████████████████████████████████
ECF No. 25, Ex. 2 at 5. ██████████████████████████████
███████████████████████████████████████ *Id.* at 6.

57.    To that end, the economic arrangement between these self-proclaimed "partners" ensures their fortunes rise and fall with the success of the NBA Top Shot enterprise.

<u>The NBA shares in both the risks and rewards of the NBA Top Shot Enterprise</u>

58.    NBA Properties, Inc. controls the intellectual property of all 30 NBA teams,[44] including the copyrights to all its games and trademarks for various names and logos.  NBA Top Shot is thus a vehicle for the NBA to exploit its own intellectual property.  As Dapper's CEO

---

[38] *Id.*

[39] YouTube, *NBA Top Shot Collecting and Fandom with Adam Silver at NBA Con 2023*, , https://www.youtube.com/watch?v=e2AoRSscJJQ. Counsel has downloaded copies of this video in case it is removed from the NBA Top Shot account.

[40] *Id.* at 16:21.

[41] *Id.* at 20:18.

[42] *Id.* at 8:42.

[43] *Id.* at 20:43.

[44] CAPS, NBA, https://capsinfo.com/caps-member-nba/.

noted, "One of the coolest things … of digital products on the blockchain rather than sort of the physical, is the player [and the league] is incentivized right along with the collector through that entire journey of that asset … Every time it's traded there's a … fee that gets split between us [Dapper Labs], the NBA and the Players' Association."[45]  NBA commissioner Adam Silver agreed: "when we read about those [trading] cards that get re-traded in some cases for millions of dollars, that the people who are benefitting from those trades, especially the speculators, have nothing to do with … the people who created it.  So there's something nice about the whole blockchain notion that … you can see you, the originator of that moment, <u>can stay connected to it forever</u>."[46]  Adam Silver added "we have a social media community around the NBA … and now there's a way to have <u>ownership</u> over that; to have that moment be yours."[47]  He reiterated: "Again [,] <u>you can really feel the ownership</u>."[48]  Dapper CEO Roham Gharegozlou agreed that The "NBA and the Players Association [have] kind of <u>permanent ownership</u> that [flows from] the IP that they're helping generate."[49]  He added that this new "<u>form of ownership</u> … <u>aligns incentives</u>" and did not neatly fit traditional labels like that of a "royalty" or "equity."[50]

59.    As confirmed by the licensing agreements, the NBA ██████████████████ ███████████████████████████████████████████████████████████████ ██████████████████████████████████████████████  ECF No. 25, Ex. 2 at 6.

60.    Moreover, the lion's share of the enterprise value of the NBA rests with its brand and goodwill.  Aside from this, the NBA and its teams own a small collection of practice gyms, basketballs, towels, and other physical assets that are negligible on its balance sheet.  The NBA's decision to partner with an upstart blockchain company is a tremendous risk that could negatively

---

[45] YouTube, *NBA Top Shot Collecting and Fandom with Adam Silver at NBA Con 2023*, https://www.youtube.com/watch?v=e2AoRSscJJQ at 25:02.

[46] *Id*. at 9:26.

[47] *Id*. at 4:48.

[48] *Id*. at 5:18.

[49] *Id*. at 25:38.

[50] *Id*. at 26:06.

impact its goodwill.  Indeed, there are numerous examples of other entertainers[515253]—including

NBA stars[54]—who have risked reputational damage (and been the subject of lawsuits) for being

investors and promoters of other cryptocurrency enterprises.  ████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████  ECF No. 25, Ex. 2 at 9.

61.     To protect itself from this reputational risk, which would tarnish the value of its

brand and goodwill, the NBA took an active role in controlling the direction of the NBA Top Shot

enterprise.

<u>The NBA exerts significant control over the NBA Top Shot Enterprise</u>

62.     As Dapper's CEO commented, the relationship between the parties was much more

involved than a typical arm-length IP licensing agreement.  The way "NBA interacts with startups

and technology companies is different … the NBA has been with us as <u>a partner</u> has also helped us

think innovatively and also think big and be sustainable."[55]  Indeed, the NBA recently exerted

control over the enterprise by requiring NBA Top Shot to add a consent pop-up.  ECF No. 25-12,

reproduced on the next page.

---

[51] Securities & Exchange Commission Press Release, *Two Celebrities Charged With Unlawfully Touting Coin Offerings*, https://www.sec.gov/news/press-release/2018-268.

[52] New York Post, *Logan Paul still hasn't refunded fans who lost 'millions' on CryptoZoo game*, https://nypost.com/2023/07/14/logan-paul-hasnt-refunded-fans-who-lost-money-on-cryptozoo/.

[53] Los Angeles Times, *Jimmy Fallon hyped his Bored Ape NFTs on 'The Tonight Show.' Conflict of interest?*, https://www.latimes.com/business/technology/story/2022-01-26/jimmy-fallon-nft-ape-nbc.

[54] Sports Illustrated, *Shaq Had Steph Curry Feeling So Awkward With What Seemed to Be a Subtle FTX Joke*, https://www.si.com/extra-mustard/2023/05/24/shaq-steph-curry-awkward-subtle-ftx-joke.

[55] YouTube, *NBA Top Shot Collecting and Fandom with Adam Silver at NBA Con 2023*, https://www.youtube.com/watch?v=e2AoRSscJJQ at 16:21.

1



13    63.    While Plaintiffs stopped using NBA Top Shot since filing this lawsuit and Plaintiffs

14 do not recall ever having clicked the "I Agree" button on this pop-up, the pop-up nevertheless

15 sheds significant light on the nature of the NBA's relationship with Dapper Labs.

16    64.    The consent pop-up shows that "NBA Properties, Inc." is itself actively

17 participating in the operation of the NBA Top Shot website and "collecting personal information"

18 from anonymous users for *its own* commercial purposes.  It ostensibly asks anonymous users to

19 consent to "the NBA Privacy Policy" and "that your personal information will be collected, stored,

20 and processed … by NBA Properties, Inc.  The consent pop-up asks consumers to consent to

21 allow "the NBA to send me messages and advertisements about products and initiatives of the

22 NBA and NBA partners."  And while the language of the NBA Privacy Policy is exceedingly

23 broad and fails to specify exactly what information the NBA is collecting and what it is using it for,

24 it may suggest that the NBA was also personally involved in using the Meta Pixel to create

25 targeting advertising.[56]  "This Privacy Policy explains how the NBA Family ('we,' 'our' or 'us')

26 processes personal data about individuals in connection with providing <u>our products and services,</u>

27

---

28    [56] NBA Privacy Policy, https://www.nba.com/privacy-policy.

including through our websites, apps and digital platforms that link to or display this Privacy Policy (the 'Online Services').''[57]  Mirroring the same broad language used in the Dapper Privacy Policy, the NBA Privacy Policy also says "[w]hen you interact with our Online Services or open our emails, we may obtain certain information by automated means, such as through cookies, web server logs, web beacons (including pixels and tags), technology to review how fans interact with our Online Services.''[58]  Both Defendants previously asserted in their joint motion to dismiss that this same language could be read to refer to the website's use of the Meta Pixel, ECF No. 25 at 21, and Defense counsel again relied on this same language during oral argument on the motion.

65.    Additionally, the NBA's agreement with Dapper ██████████████████████████ ██████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████████████████ Ex. 2, ECF No. 26-3 at 4-5. ████████████████████████████████████████████████████ ███████████████████████████████████ *Id.* at 4.

66.    Beyond these indicia of control, the NBA and Dapper also ████████████ ██████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████████ ███████████████████████████████████████████████████ █████████████████████████████████████████████████████████ ███████████████████████████████████ ECF No. 25, Ex. 2 at 5-6 (emphasis added).

67.    ██████████████████████████████████████████████████ ██████████████ ECF No. 25, Ex. 2 at 3.

---

[57] *Id.*

[58] *Id.*

1    68.    ████████████████████████████████████████████

2    ECF No. 25, Ex. 2 at 9. ████████████████████████████████

3    ████████████████████████████████ *Id.* ████████████████

4    ████████████████████████████████████████████████

5    ████████████████████████████████████████████

6    ████████████████████████████████ *Id.*

7    **E.    Experience of Plaintiffs**

8        69.    In or around December 2021, Plaintiff Thomas Fan purchased an NBA Top Shot

9    video clip NFT on nbatopshot.com.

10        70.    Prior to this purchase, he had created both a Facebook account and NBA Top Shot

11    account.

12        71.    When Plaintiff Fan watched and purchased video clips on nbatopshot.com,

13    Defendants disclosed his event data, which recorded and disclosed the video's title, URL, and

14    video description to Meta.  Alongside this event data, Defendants also disclosed identifiers for

15    Plaintiff Fan including the c_user and fr cookies to Meta.

16        72.    By disclosing his event data and identifiers, Defendants disclosed Plaintiff Fan's

17    personally identifiable information to a third-party, Meta.

18        73.    Plaintiff Fan discovered that Defendants surreptitiously collected and transmitted

19    his personally identifiable information in September 2023.

20        74.    In or around September 9, 2022, Plaintiff Matthew Kimoto purchased an NBA Top

21    Shot video clip NFT on nbatopshot.com.

22        75.    Prior to this purchase, he had created both a Facebook account and NBA Top Shot

23    account.

24        76.    When Plaintiff Kimoto watched and purchased video clips on nbatopshot.com,

25    Defendants disclosed his event data, which recorded and disclosed the video's title, URL, and

26    video description to Meta.  Defendants also disclosed identifiers for Plaintiff Kimoto including the

27    c_user and fr cookies to Meta.

28

77.     By disclosing his event data and identifiers, Defendants disclosed Plaintiff Kimoto's personally identifiable information without his consent to a third-party, Meta.

78.     Plaintiff Kimoto discovered that Defendants surreptitiously collected and transmitted his personally identifiable information in September 2024.

79.     In or around June 2024, Plaintiff Clinton Brown visited nbatopshot.com and viewed an NBA Top Shot video clip NFT.

80.     Within the past two years, Plaintiff Brown purchased an NBA Top Shot video clip NFT on nbatopshot.com.

81.     Prior to this purchase, he had created both a Facebook account and NBA Top Shot account.

82.     When Plaintiff Brown watched and purchased video clips on nbatopshot.com, Defendants disclosed his event data, which recorded and disclosed the video's title, URL, and video description to Meta.  Defendants also disclosed identifiers for Plaintiff Brown including the c_user and fr cookies to Meta.

83.     By disclosing his event data and identifiers, Defendants disclosed Plaintiff Brown's personally identifiable information without his consent to a third-party, Meta.

84.     Plaintiff Brown discovered that Defendants surreptitiously collected and transmitted his personally identifiable information in September 2024.

## CLASS ALLEGATIONS

85.     **Class Definition**: Plaintiffs seek to represent a class of similarly situated individuals defined as all persons in the United States who have Facebook and nbatopshot.com accounts, and viewed or purchased video clips on nbatopshot.com during the statutory period (the "Class").

86.     **California Subclass**: Plaintiffs seek to represent a class of similarly situated individuals defined as all persons in the state of California who have Facebook and nbatopshot.com accounts, and viewed or purchased video clips on nbatopshot.com during the statutory period (the "California Subclass" or "Subclass").

87.     **Numerosity (Fed. R. Civ. P. 23(a)(1))**:  At this time, Plaintiffs do not know the exact number of members of the aforementioned Class and Subclass.  However, given the

popularity of Defendants' website, the number of persons within the Class and Subclass is believed to be so numerous that joinder of all members is impractical.

88.    **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2), 23(b)(3))**:  There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class and Subclasses that predominate over questions that may affect individual members of the Class and California Subclass include:

(a)    whether Defendants collected Plaintiffs' and the Class's PII;

(b)    whether Defendants unlawfully disclosed and continue to disclose Plaintiffs' and the Class's PII in violation of the VPPA;

(c)    whether Defendants' disclosures were committed knowingly;

(d)    whether Defendants disclosed Plaintiffs' and the Class's PII without consent; and

(e)    whether Defendants' conduct violates California Civil Code § 1799.3.

89.    **Typicality (Fed. R. Civ. P. 23(a)(3))**:  Plaintiffs' claims are typical of those of the Class because Plaintiffs, like all members of the Class and Subclass, used nbatopshot.com to watch videos, and had their PII collected and disclosed by Defendants.

90.    **Adequacy (Fed. R. Civ. P. 23(a)(4))**:  Plaintiffs have retained and are represented by qualified and competent counsel who are highly experienced in complex consumer class action litigation, including litigation concerning the VPPA.  Plaintiffs and their counsel are committed to vigorously prosecuting this class action.  Moreover, Plaintiffs are able to fairly and adequately represent and protect the interests of the Class.  Neither Plaintiffs nor their counsel have any interest adverse to, or in conflict with, the interests of the absent members of the Class.  Plaintiffs have raised viable statutory claims of the type reasonably expected to be raised by members of the Class and Subclasses, and will vigorously pursue those claims.  If necessary, Plaintiffs may seek leave of this Court to amend this Class Action Complaint to include additional representatives to represent the Class and Subclass, additional claims as may be appropriate, or to amend the definition of the Class and Subclass to address any steps that Defendants may take.

91.    **Superiority (Fed. R. Civ. P. 23(b)(3))**:  A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Class and Subclass is impracticable.  Even if every member of the Class and Subclass could afford to pursue individual litigation, the court system could not.  It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.  Individualized litigation would also present the potential for varying, inconsistent or contradictory judgments, and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues.  By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system and protects the rights of each member of the Class and Subclasses.  Plaintiffs anticipate no difficulty in the management of this action as a class action.

## CAUSES OF ACTION
### COUNT I
**Violation of the Video Privacy Protection Act**
**18 U.S.C. §§ 2710, *et seq.***

92.    Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

93.    Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against Defendants.

94.    Defendants are "video tape service provider[s]" because they create, host, deliver, and sell thousands of videos on their website, thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials."  18 U.S.C. § 2710(a)(4).

95.    Plaintiffs and members of the Class are "consumers" because they have accounts with nbatopshot.com and purchase video clips from nbatopshot.com.  18 U.S.C. § 2710(a)(1).

96.    Defendants disclosed to a third party, Meta, Plaintiffs' and the Class members' personally identifiable information.  Defendants utilized the Meta Tracking Pixel to compel

Plaintiffs' web browsers to transfer Plaintiffs' identifying information, like their Facebook ID, along with Plaintiffs' event data, like the title of the videos they viewed and purchased.

97.     Plaintiffs and the Class members viewed and purchased videos using nbatopshot.com.

98.     Defendants knowingly disclosed Plaintiffs' and Class members' PII because they used that data to build audiences on Meta and retarget Plaintiffs and Class members for Defendants' advertising campaigns.

99.     Plaintiffs and Class members did not provide Defendants with any form of consent—either written or otherwise—to disclose their PII to third parties.

100.     Nor were Defendants' disclosures made in the "ordinary course of business" as the term is defined by the VPPA.  In particular, Defendants' disclosures to Meta were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership."  18 U.S.C. § 2710(a)(2).

101.     Defendants are jointly and severally liable for this conduct because both Defendants actively participated in the operation and control of the NBA Top Shot website.

102.     On behalf of themselves and the Class, Plaintiffs seek: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiffs and the Class by requiring Defendants to comply with VPPA's requirements for protecting a consumer's PII; (iii) statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c); and (iv) reasonable attorneys' fees and costs and other litigation expenses.

## COUNT II
### Violation of California Civil Code § 1799.3

103.     Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

104.     Plaintiffs bring this claim individually and on behalf of the members of the proposed California Subclass against Defendants.

105.     Cal. Civ. Code § 1799.3(a) prohibits a "person providing video recording sales … services" from disclosing "any personal information or the contents of any record, including sales

or rental information, which is prepared or maintained by that person, to any person, other than the individual who is the subject of the record, without the written consent of that individual."

106.    Defendants are "person[s] providing video recording sales … services" because they sell ownership of pre-recorded video clips through their website, nbatopshot.com.  Defendants also provide a platform for third parties to sell their video clips to other purchasers, also through their website, nbatopshot.com.

107.    Defendants disclosed to a third party, Meta, Plaintiffs' and California Subclass members' personal information.  Defendants utilized the Meta Tracking Pixel to compel Plaintiffs' web browsers to transfer Plaintiffs' identifying information, like their Facebook IDs, along with Plaintiffs' event data, like the title of the videos they viewed and purchased.

108.    Plaintiffs and the California Subclass members viewed and purchased videos using nbatopshot.com.

109.    Defendants willfully disclosed Plaintiffs' and the California Subclass members' PII because Defendants used that data to build audiences on Facebook and retarget Plaintiffs and the California Subclass members for Defendants' advertising campaigns.

110.    Plaintiffs and California Subclass members did not provide Defendants with any form of consent—either written or otherwise—to disclose their PII to third parties.

111.    Defendants are joint and severally liable for this conduct because both Defendants actively participated in the operation and control of the NBA Top Shot website.

112.    On behalf of themselves and the California Subclass, Plaintiffs seek: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiffs and the California Subclass by requiring Defendants to comply with Cal. Civ. Code § 1799.3's requirements for protecting a consumer's PII; (iii) statutory damages of $500 for each violation of this law pursuant to Cal. Civ. Code § 1799.3(c); and (iv) reasonable attorneys' fees and costs and other litigation expenses.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs seek a judgment against Defendants, individually and on behalf of all others similarly situated, as follows:

(a)     For an order certifying the Class and the California Subclass under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiffs as representatives of the Class and California Subclass, and naming Plaintiffs' attorneys as Class Counsel to represent the Class and the California Subclass;

(b)     For an order declaring that Defendants' conduct violates the statutes referenced herein;

(c)     For an order finding in favor of Plaintiffs and the Class and the California Subclass on all counts asserted herein;

(d)     An award of statutory damages to the extent available;

(e)     For punitive damages, as warranted, in an amount to be determined at trial;

(f)     For prejudgment interest on all amounts awarded;

(g)     For injunctive relief as pleaded or as the Court may deem proper; and

(h)     For an order awarding Plaintiffs and the Class their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all claims so triable.


Dated:  November 1, 2024          **BURSOR & FISHER, P.A**.

                                  By:  */s/ L. Timothy Fisher*

                                  L. Timothy Fisher (State Bar No. 191626)
                                  Stefan Bogdanovich (State Bar No. 324525)
                                  1990 North California Blvd., 9th Floor
                                  Walnut Creek, CA 94596
                                  Telephone: (925) 300-4455
                                  Facsimile: (925) 407-2700
                                  E-mail: ltfisher@bursor.com
                                          sbogdanovich@bursor.com

                                  *Attorneys for Plaintiffs*